IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 08-cv-00999-DME-MEH

AMANDA HALL,

       Plaintiff,

v.

LESHAWN TERRELL, Sergeant at the Denver Women's Correctional Facility and the
    Denver Reception and Diagnostic Center, in his individual and official capacities,

       Defendant.

**OPINION AND ORDER**

"You have the right to be safe from sexual assault/rape. You have the right to be safe from unwanted sexual advances." Thus are inmates of the Colorado Department of Corrections ("CDOC") counseled under the agency's "Prison Rape Elimination Procedure," Administrative Regulation Number 100-40. (Exh. 12 at 1873.) Indeed, CDOC declares that it "has a zero-tolerance policy relating to sexual assault/rape and sexual misconduct. It is the policy of the DOC to fully investigate and aggressively prosecute those who are involved in such conduct." (Id. at 1860.)

For Amanda Hall, an inmate at Denver Women's Correctional Facility ("DWCF"), the right to be safe from sexual assault and rape by one of her guards turned out to be worth no more than the paper upon which Regulation 100-40 was printed. For five months, from May through October of 2006, Sergeant Leshawn Terrell, Hall's supervisor

in her work assignment in the kitchen of the Denver Reception and Diagnostic Center ("DRDC"), coerced her into having a sexual relationship with him. When Hall finally summoned the courage to refuse his advances, on October 7, 2006, Terrell brutally raped and sodomized her, causing her lasting physical and emotional injury.

Almost inconceivably, given both the violence of Terrell's attack and CDOC's policy of zero tolerance for and aggressive prosecution of sexual assaults on inmates, Terrell was permitted, in his criminal prosecution, to plead guilty to a class 1 misdemeanor: unlawful sexual contact where the "[t]he actor knows that the victim does not consent." Colo. Rev. Stat. Ann. § 18-3-404(1)(a). (Exh. 22.)[1] He was sentenced to sixty days' imprisonment in the Denver County Jail, to be followed by five years of sex offender probation.

I.   Hall's lawsuit under 42 U.S.C. § 1983

Dissatisfied with CDOC's response to the grievances she had filed against Terrell, as well as with Terrell's criminal prosecution, Hall filed this federal lawsuit pursuant to 42 U.S.C. § 1983, alleging violations of her civil rights under the Eighth and Fourteenth Amendments. She sought actual, compensatory, and punitive damages, as well as injunctive remedies. The lawsuit originally named eight defendants in addition to Terrell; those defendants, who held positions of authority within CDOC and DWCF, reached a

---

[1]Terrell initially was charged with the class 5 felony of sexual conduct in a penal institution, pursuant to Colo. Rev. Stat. Ann. § 18-7-701, as well as with unlawful sexual contact.

settlement agreement with Hall and were dismissed as parties to the lawsuit on April 13, 2009.

Despite having been served with process, Terrell never responded to Hall's complaint or amended complaint, and default judgment was entered against him on February 3, 2009. In its order granting Hall's motion for default judgment, this Court concluded that Hall's factual allegations, which were deemed admitted by Terrell when he did not respond to them, established that he had violated both Hall's Eighth Amendment right to be free from cruel and unusual punishment and her Fourteenth Amendment substantive due process right to bodily integrity. On April 20, 2009, the Court held a bench trial to determine the type and amount of damages Hall should recover from Terrell for his violation of those rights. Terrell did not appear at trial.

II.     Facts established at the trial on damages

Hall's ordeal with Terrell began on Mother's Day of 2006, when Terrell approached her during her shift in the DRDC kitchen and asked, "can I get some pussy?"[2] In exchange for sex, Terrell told Hall, he would "take care of" her. Like other women held at DWCF, Hall had learned of Terrell's reputation for having coercive sexual relationships with several inmates. She believed that he, in turn, had learned of her history of childhood sexual abuse through his access to inmates' records, and that he had

---

[2]While the Court is reluctant to repeat Terrell's coarse language, it does so to convey accurately the nature of his conduct towards Hall.

chosen her as a victim at least in part because of this history.[3] She also believed that he may have chosen her because he knew that another inmate with whom he was having sex was a friend of Hall's and had told Hall "about what they did."

Hall feared the consequences of refusing Terrell's advances. Terrell had the power to have inmates under his supervision put in segregation, or to "set [them] up" for disciplinary action by planting on them items from DRDC that would be discovered when the inmates were strip-searched as they returned to DWCF. Unwilling to risk those consequences, Hall complied with Terrell's instruction to go into the kitchen cooler to wait for him, and further complied with his request that she perform oral sex on him. Under CDOC regulations, implemented in compliance with the Prison Rape Elimination Act ("PREA"), such inmate compliance cannot be construed as consent, in light of the custodial relationship between an inmate and her guard. As a CDOC Inspector testified, "[i]n prison systems, there's no such thing as consensual sex" between a guard and an inmate.

After this first episode, Terrell expected Hall "to sexually be with him pretty much every shift" that she worked in the DRDC kitchen, five days each week. At the time,

---

[3]Hall's stepfather began physically and sexually abusing her when she was eleven years old and raped her when she was fourteen.

A criminal investigator/team leader in the CDOC's Office of the Inspector General testified that in their training in compliance with the Prison Rape Elimination Act, CDOC employees learn that female prisoners who previously have been victims of sexual abuse "tend to continue on as victims of abuse." (See Ex. 15 at 1832.) He further testified that while prison guards generally do not have access to inmates' psychiatric history, because Hall was working under Terrell's supervision in the kitchen, Terrell would have had access to information about her offense of conviction, length of incarceration, "and some limited psychiatric history."

4

none of the kitchen area was covered by surveillance cameras; thus, Terrell had little difficulty in arranging sexual encounters with Hall without worry that his conduct would be discovered by his CDOC superiors.[4]

Believing that she could not refuse his continuing demands for sex, Hall began searching for ways to avoid going to work at DRDC. Transferring to another job was not an option, as her application for transfer would first have had to be approved by Terrell as her supervisor, and he told her "there was no way that he was going to let [her] out of the kitchen." She had a brief break from Terrell's sexual advances in June of 2006, when she had surgery to remove a lump from her breast. During the week that she was in the infirmary recovering, however, Hall once awoke to discover Terrell outside her window, watching her. Later, after she had returned to work, she received a thirty-day "lay-in," a period in which she was permitted to stay in her DWCF unit rather than going to work, due to carpal tunnel syndrome. She sought that lay-in in the hope that during her absence, Terrell "would find someone else," because she "didn't want to do it anymore," but "[h]e wouldn't stop." In fact, once she returned from the lay-in, Terrell became "worse" and "more demanding."

On October 7, 2007, Terrell took Hall off of her serving line and told her to go into the bakery cooler to wait for him. This time, Hall refused, telling Terrell she would no longer have sex with him. When he became angry and aggressive, she complied and went into the cooler; there, Terrell became violent when she again refused to have sex

---

[4] Surveillance cameras now have been installed in both kitchens at DRDC.

with him.  He demanded that she get on her knees and perform oral sex, and shoved his penis in her mouth.  Forcing her to get up from her knees and bend over, he then anally raped her, telling her as he did so, "that's my pussy; you don't ever tell me no."  Terrell's "slamming himself into" her was sufficiently violent that the rape tore Hall's rectum, an injury that required surgery to repair.  After the rape, Terrell left a bleeding Hall on the floor of the cooler and told her to "go clean [her]self up."[5]

For nearly two years following the rape, Hall suffered pain and bleeding when she defecated.  She repeatedly attempted to get medical treatment at DWCF, putting in kites informing the medical staff that bowel movements caused her to bleed.  For nearly two years, rather than doing an examination to determine the source of her bleeding, the medical staff told Hall to use stool softeners, Milk of Magnesia, or hemorrhoid cream.  Finally, after filing this federal lawsuit, Hall did receive a full medical examination,

---

[5]Hall did not report the rape immediately, nor did she disclose the rape in her initial interviews with CDOC officials once Terrell's sexual conduct with inmates had begun to be investigated.  For various reasons, including inmates' fear of being labeled "snitches," their fear of retaliation, their reluctance to trust the CDOC investigators who interview them (and who have the ability to discipline the inmates, under the Code of Penal Discipline, for making what the investigators determine to be false charges), and their humiliation and embarrassment over what has happened to them, the DWCF "prison culture" has become one of non-reporting of sexual assault.

Because Hall had not yet reported the October 7, 2006, rape to CDOC officials when the Denver District Attorney filed charges against Terrell on October 31, 2006, the District Attorney was not aware of that rape when he charged Terrell with one count of unlawful sexual contact in a penal institution, a class 5 felony under Colo. Rev. Stat. Ann. § 18-7-101, and one count of unlawful sexual contact, a class 1 misdemeanor under Colo. Rev. Stat. Ann. § 18-3-404(1)(a).  In fact, because Hall did not file her first grievance against Terrell until November of 2006, the October 31, 2006, charges seemingly were based upon grievances filed by other inmates (see, e.g., Exh. 10, 11).

However, the D.A. was aware of the rape by October 28, 2008, when Terrell was permitted to plead guilty solely to the misdemeanor count of unlawful sexual contact.

which revealed that she needed surgery to repair her torn rectum. She underwent a lateral sphincterotomy at Denver Health Medical Center on August 28, 2008.[6]

Denied proper medical evaluation and treatment of her physical injuries for almost two years following the rape, Hall was also denied the opportunity for treatment of her emotional harm. In order to be eligible for consideration for parole, she was required to participate in the "TC program," which is the "therapeutic community" at DWCF. The TC program is designed to help inmates work through their childhood and adult traumas and develop strategies for anger management and self-improvement. In one part of the program, called "game," inmates sit in a circle with their peers and talk about issues that are troubling them, and the group provides peer support. However, when Hall attempted to talk about the rape during a game session, she was disallowed from doing so, because Terrell was an officer at DWCF and because, according to the counselor, "he wasn't [t]here to defend himself." Hall's peers, by contrast, were permitted to talk about having been raped by men who likewise were not there to defend themselves. Hall ended up quitting the TC program.

Hall's expert, Dr. Antoinette Anker, explained that Hall's emotional injury from the rape was also exacerbated by her childhood history of abuse and victimization. Dr. Anker summarized CDOC mental health records showing that Hall had experienced "an acceleration and exaggeration of psychological symptoms immediately after the rape,"

---

[6]The costs of Hall's treatment at Denver Health were as follows: $108.00 for an office visit on July 30, 2008; $3,885.41 for the surgical procedure on August 28, 2008; and $77.00 for an office visit on September 17, 2008. (Exh. 4.) These costs were billed to CDOC. (Id.)

including extreme depression and agitation, difficulty sleeping, nightmares, and crying. Hall's reaction to the rape was further exacerbated, according to Dr. Anker, by the fact that because she continued to work in the DRDC kitchen, she frequently revisited a place that reminded her of her trauma. Even Hall's physical injury ultimately "ended up becoming a broader psychological injury as well," Dr. Anker explained, because experiencing bleeding and pain when she defecated caused Hall repeatedly to relive the trauma of the rape. Having to ask for medical treatment so many times before she was finally evaluated and properly treated likewise added to Hall's humiliation and psychological stress.

Finally, testimony established that despite CDOC's announced policy of "zero tolerance" of sexual abuse of inmates, such abuse apparently remains distressingly common in Colorado prisons. The Court received testimony that several guards working at DWCF are well known by inmates to be engaged in inappropriate sexual relationships with inmates. Further, the Court received evidence that it is not uncommon for CDOC to have to dismiss prison staff at the Denver complex because of sexual misconduct. And a former DWCF inmate who has also been incarcerated in other Colorado prisons made clear that guards' sexual abuse of inmates is by no means limited to DWCF, but occurs at "every facility" where she had been held.

III.   Damages under 42 U.S.C. § 1983

A.   *Compensatory damages*

The Supreme Court has "repeatedly noted that 42 U.S.C. § 1983 creates a species of tort liability in favor of persons who are deprived of rights, privileges, or immunities secured to them by the Constitution." Memphis Cmty. Sch. Dist. v. Stachura, 477 U.S. 299, 305-06 (1986) (quotations omitted). "Accordingly, when § 1983 plaintiffs seek damages for violations of constitutional rights, the level of damages is ordinarily determined according to principles derived from the common law of torts." Id.  Within that common law of torts, "[t]he cardinal principle of damages . . . is that of compensation for the injury caused to plaintiff by defendant's breach of duty." Carey v. Piphus, 435 U.S. 247, 254-55 (1978); see also id. at 257-58. Compensable injuries "may include not only out-of-pocket loss and other monetary harms, but also such injuries as impairment of reputation, personal humiliation, and mental anguish and suffering." Stachura, 477 U.S. at 307.

A plaintiff must prove "actual injury" to recover compensatory damages under § 1983. Carey, 435 U.S. at 248; see Makin v. Colo. Dep't of Corr., 183 F.3d 1205, 1214-15 (10th Cir. 1999); Dill v. City of Edmond, Okla., 155 F.3d 1193, 1208-09 (10th Cir. 1998). Crucial in this regard is the Supreme Court's holding, in Stachura, that a court may not award § 1983 damages based merely on "'the abstract value of a constitutional right.'" Makin, 183 F.3d at 1214 (quoting Stachura, 477 U.S. at 308). In other words, the

constitutional violation in and of itself is not tantamount to compensable injury under § 1983; instead, that violation must have caused the plaintiff demonstrable harm.

Having carefully considered the evidence presented at trial, the Court finds that Hall is entitled to **$354,070.41** in compensatory damages. This sum comprises $4,070.41 in medical costs attributable to Hall's physical injuries and $350,000.00 for emotional distress, mental anguish, and suffering. The Court has no doubt that Terrell inflicted willful and malicious injury upon Hall, and that she has suffered greatly as a result. Terrell caused her substantial humiliation, brutally raping her and leaving her bleeding on the floor in what he clearly intended to be an utterly degrading event. The torn rectum she suffered as a result of the rape led to severe pain and bleeding when she defecated, causing her to relive her trauma on nearly a daily basis. Furthermore, her emotional distress was exacerbated by her vulnerability: not only was Hall a victim of sexual abuse and rape when she was a child–a fact that she believes may have led Terrell to choose her as his prey–but she was also, as a prisoner, quite literally unable to escape her assailant's advances.[7] She thus experienced fear and intimidation on a daily basis; as the incident in the infirmary made clear, Terrell seemingly could get to her anywhere, at any time.

B.   *Punitive damages*

In Smith v. Wade, 461 U.S. 30, 51 (1983), the Supreme Court held that a factfinder "may be permitted to assess punitive damages in an action under § 1983" in

---

[7]The Court notes that in the context of criminal prosecutions, the federal Sentencing Guidelines explicitly account for victim vulnerability, increasing a defendant's offense level by two if the defendant "knew or should have known that a victim of the offense was a vulnerable victim." U.S.S.G. § 3A1.1(b)(1).

10

either of two circumstances: (1) "when the defendant's conduct is shown to be motivated by evil motive or intent," or (2) when that conduct "involves reckless or callous indifference to the federally protected rights of others." Id. at 56. "Federal standards govern the determination of damages under the federal civil rights statutes," including § 1983. Malloy v. Monahan, 73 F.3d 1012, 1016 (10th Cir. 1996). Probably the most important consequence of the application of federal law in this context is that state limitations on damages–including, in this case, Colorado's limitation on punitive damages–do not apply in a § 1983 case. See 1B Martin A. Schwartz, Section 1983 Litigation: Claims and Defenses § 16.04[B][4] (4th ed. 2008).

The "consensus today is that punitives are aimed not at compensation but principally at retribution and deterring harmful conduct." Exxon Shipping Co. v. Baker, 554 U.S. —, 128 S. Ct. 2605, 2621 (2008) (footnote omitted). Punitive damages "should reflect 'the enormity of [the defendant's] offense,'" a principle that "reflects the accepted view that some wrongs are more blameworthy than others." BMW of N. Am., Inc. v. Gore, 517 U.S. 559, 575 (1996) (quoting Day v. Woodworth, 13 How. 363, 371 (1852)). "Certainly, evidence that a defendant has repeatedly engaged in prohibited conduct while knowing or suspecting that it was unlawful would provide relevant support for an argument that strong medicine is required to cure the defendant's disrespect for the law." Id. at 576-77.

Furthermore, "[r]egardless of culpability, . . . heavier punitive awards have been thought to be justifiable when wrongdoing is hard to detect (increasing chances of getting

11

away with it), or when the value of injury and the corresponding compensatory award are small (providing low incentives to sue)." Exxon Shipping, 128 S. Ct. at 2622. Finally, even where, as in this case, the defendant is no longer a public official at the time of trial,[8] a punitive damages award serves the purpose of deterrence because it "will deter others in such positions of public authority from future disregard of the constitutional rights" of those over whom they exercise that authority. Miller v. City of Mission, Kan., 705 F.2d 368, 377 (10th Cir. 1983).

The Court has carefully considered (1) the enormity of Terrell's conduct in his infliction of willful and malicious injury upon Hall; (2) the evidence that he repeatedly engaged in that conduct while knowing both that it was unlawful and that, because of the absence of surveillance cameras, it would be difficult to detect; and (3) the evidence that Terrell, and apparently at least some of his fellow CDOC officers, are in need of a strong punitive award in this case to cure them of their disrespect for the law, and thus to deter them from future violations of inmates' civil rights. Based on that consideration, the Court finds that Hall is entitled to **$1,000,000.00** in punitive damages.

The Court recognizes that punitive damage awards often are over-inflated, but believes an award of this magnitude is justified under the disturbing circumstances of this case. Terrell has shown no remorse for his ongoing sexual abuse of Hall and others, and this Court is appalled that despite CDOC's "zero tolerance" and "aggressive prosecution"

---

[8]Having failed to appear for any of his scheduled administrative interviews while CDOC was investigating the complaints against him, Terrell delivered his handwritten letter of resignation to CDOC on March 19, 2007. (See Exh. 20.)

policy–and despite the horrific violence of the October 7, 2006, rape–the Denver District Attorney permitted Terrell to plead to a class 1 misdemeanor offense that carried a 60-day term of imprisonment. The Court acknowledges that the D.A.'s office did not have information as to the October 7 rape when it brought charges against Terrell, but it apparently did have that information, as well as Hall's medical records showing the physical injury she suffered, when it permitted Terrell to make his plea. In light of Terrell's violent, willful and malicious conduct, that plea appears to this Court to be simply egregious, and not remotely supportive of a policy of zero tolerance for sexual abuse in Colorado's prisons.

Given the circumstances of this case, the Court believes that the sum of $1,000,000.00 in punitive damages is both adequate and reasonable to accomplish the dual aims of retribution and deterrence.

IV.     Potential offset of settlement with state defendants

The rule against double recovery dictates that a plaintiff may not be compensated twice for the same injury. See Hardeman v. City of Albuquerque, 377 F.3d 1106, 1117-18 (10th Cir. 2004) ("The prohibition on double recovery would undoubtedly bar [the plaintiff] from being compensated twice for the [same] loss . . . ." (emphasis added)); Clappier v. Flynn, 605 F.2d 519, 529 (10th Cir. 1979). Here, Hall's settlement agreement with the state defendants included a compensation component; thus the Court must determine whether the amount of that compensation must be offset against the amount of damages awarded here against Terrell.

The Court concludes that no offset is necessary or appropriate in this case. The settlement agreement itself recites that the parties did not intend for the state defendants' payments to Hall to be offset against any damages awarded against Terrell. That statement is not determinative, however, because whether compensation must be offset to prevent double recovery is a matter of law. Far more compelling, and ultimately dispositive, is that evidence at trial established that Hall suffered a number of harms–such as being denied the opportunity to talk about her rape in the TC program and being denied proper medical care for nearly two years after the rape–for which she could have been compensated by the state defendants alone. Therefore, the Court concludes that the payments Hall will receive under the settlement agreement constitute compensation for harms different from those for which she will be compensated by the damages awarded here against Terrell.

V.      Equitable relief under 42 U.S.C. § 1983

Section 1983 specifically authorizes "suit[s] in equity." However, because Terrell is no longer a CDOC employee, and thus no longer a state actor for purposes of § 1983, Hall faces a difficult challenge in demonstrating that the equitable relief she seeks would correct the violation of one of her federal rights. She asks this Court to (1) enjoin Terrell from future employment in law enforcement; (2) enjoin Terrell from retaliating against her; (3) permanently restrain Terrell from contacting Hall after she is released from prison; (4) enjoin Terrell to comply with his state-ordered sex offender treatment; and (5) enjoin Terrell to write a letter of apology to Hall. While the Court is sympathetic with

each of these requests, Hall has not identified a threatened violation of a federal right that these proposed injunctions would correct. Consequently, equitable relief is DENIED.

The Court notes, however, that it is confident that Hall has reached a level of maturity such that she will immediately contact the police if Terrell threatens her in any way. The Court is likewise confident that the police would respond promptly and appropriately to any such threat.

## VI.     Conclusion

For the foregoing reasons, it is hereby ORDERED that Plaintiff, Amanda Hall, be awarded damages of $1,354,070.41 against Defendant, Leshawn Terrell, in his individual capacity. This amount comprises $354,070.41 in compensatory damages and $1,000,000.00 in punitive damages.

DATED at Denver, Colorado, this 10th day of June, 2009.

BY THE COURT:

*s/ David M. Ebel*
_____
David M. Ebel
United States Circuit Judge